MGD

WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| Shawn Franklin Reid, | No.  CV-20-01893-PHX-JAT (JFM) |
|---|---|
| Plaintiff, | |
| v. | **ORDER** |
| Centurion, et al., | |
| Defendants. | |

Plaintiff Shawn Franklin Reid, who is currently confined in the Arizona State Prison Complex (ASPC)-Tucson, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Defendants Dr. Karen Barcklay, Dr. Elijah Jordan, Nurse Practitioner (NP) Clarisse Ngueha,[1] and NP Carrie Smalley move for summary judgment.[2]  (Doc. 103.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 102), and he opposes the Motion.  (Doc. 107.)  Defendants filed a Reply.  (Doc. 121.)

. . . .

. . . .

---

[1] Plaintiff spelled Barcklay and Ngueha's names differently in his pleadings, but the Court will use the spellings provided by Defendants.  Also, Defendants sometimes write Ngueha-nana, but not always, and the Court will use Ngueha to avoid confusion.

[2] Defendant Corizon Health, Inc. ("Corizon") also filed the pending Motion for Summary Judgment, but after the filing, Corizon filed a Suggestion of Filing and Notice of Automatic Stay (Doc. 106), and therefore the proceedings in this action against Corizon are stayed.

1    **I.      Background**

2        On screening the Second Amended Complaint (Doc. 13) pursuant to 28 U.S.C.

3    § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment medical care

4    claims regarding treatment for his Hepatitis C condition against Defendants Corizon,

5    Barcklay, Jordan, Smalley, and Ngu     ea in Count One and against Defendants Barcklay,

6    Jordan, Smalley, and Ngu     a in Count Two and directed them to answer the claims.  (Doc.

7    14.)  The Court dismissed the remaining claims and Defendants.  (*Id.*)

8    **II.     Summary Judgment Standard**

9        A court must grant summary judgment "if the movant shows that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

12   movant bears the initial responsibility of presenting the basis for its motion and identifying

13   those portions of the record, together with affidavits, if any, that it believes demonstrate

14   the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

15       If the movant fails to carry its initial burden of production, the nonmovant need not

16   produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

17   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

18   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

19   contention is material, i.e., a fact that might affect the outcome of the suit under the

20   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

21   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

22   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

23   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

24   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

25   it must "come forward with specific facts showing that there is a genuine issue for trial."

26   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

27   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

28

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Relevant Facts**[3]

      **A.    Corizon's Hepatitis C Policies and Procedures**

Corizon is a private entity that contracted with the Arizona Department of Corrections (ADC) to provide medical care for ADC prisoners from 2013 to 2019. (Doc. 13 at 6.)

According to a Report published by Gilead Science, the challenges facing prisons in treating the prisoner population infected with Hepatitis C include budgetary constraints, the high cost of treatment, and the fact that incarcerated individuals are up to 13 times more likely than in the general population to have detectible levels of Hepatitis C in the blood. (Doc. 101 (Defs.' Statement of Facts (DSOF)) ¶ 61.) Recognizing these challenges, the Federal Bureau of Prisons' Clinical Guidance Manual for the Evaluation and Management of Chronic Hepatitis C (HCV) Infection (hereinafter "BOP Manual"), which was adopted by the ADC and Corizon Health, contains a comprehensive framework for prioritizing prisoners for Hepatitis C treatment so that those with the greatest need are identified and treated first. (*Id.* ¶ 62.)

---

[3] Defendants argue in their Reply that Plaintiff "submitted multiple documents as exhibits that were not previously disclosed," and those exhibits should therefore be stricken and not considered by the Court. (Doc. 121 at 2.) Plaintiff submitted three exhibits (A, B and C) with his previous response to Defendants' Motion for Summary Judgment (Doc. 91 at 34-54), and Plaintiff appears to rely on those same exhibits in his current Response. Defendants do not identify which exhibits were not disclosed, and the Court will therefore not address Defendants' request to strike any exhibits for which they have not provided any specificity. Moreover, the Court did not rely on anything in Plaintiff's Exhibits in deciding Defendants' Motion for Summary Judgment.

The BOP Manual notes that progression from chronic Hepatitis C infection to fibrosis and eventually cirrhosis may take years in some patients and decades in others, or, in some cases, may not occur at all.  (*Id.* ¶ 63.)  Most complications from Hepatitis C infection occur in people with cirrhosis; therefore, assessing for cirrhosis is important in prioritizing prisoners for Hepatitis C treatment.[4]  (*Id.* ¶¶ 64-65)

The AST (aspartate aminotransferase) to platelet ratio (APRI) score is the "BOP-preferred method for noninvasive assessment of hepatic fibrosis and cirrhosis" and "APRI scores [greater than] 2.0 may be used to predict the presence of cirrhosis."  (*Id.* ¶ 66.)  The APRI score is calculated using the results of two blood tests—the AST and the platelet count—and is considered a less expensive and less invasive means of assessing liver fibrosis than a liver biopsy.  (*Id.* ¶ 67.)  The Gilead Report similarly recognizes that the severity of liver disease in people with Hepatitis C can be estimated using formulas based on common laboratory tests.  (*Id.* ¶ 68.)  Two common methods are the APRI and the Fibrosis-4 Index.  (*Id.*)

Under the BOP standards, prisoners with "advanced hepatic fibrosis," liver transplant recipients, and those with comorbid medical conditions are the highest priority (Priority Level One) for treatment.  (*Id.* ¶ 69.)  Advanced hepatic fibrosis is demonstrated through either: (1) an APRI score [greater than] 2; (2) "Metavir or Batts/Ludwig stage 3 or 4 on liver biopsy;" or (3) known or suspected cirrhosis.  (*Id.* ¶ 70.)  Liver transplant recipients, those with certain co-morbid medical conditions, immunosuppressed patients, and those who were already started on treatment when they were incarcerated also fall into the Priority Level One category.  (*Id.* ¶ 71.)

Defendants assert that patients in the "intermediate" priority category (Priority Level 2) have an APRI score greater than 1 and/or "stage 2 fibrosis" on a liver biopsy.

---

[4] "Liver fibrosis is the excessive accumulation of extracellular matrix proteins including collagen that occurs in most types of chronic liver diseases.  Advanced liver fibrosis results in cirrhosis, liver failure, and portal hypertension and often requires liver transplantation."  National Library of Medicine, *Liver Fibrosis*, Abstract from *J Clin Invest*, available at https://pubmed.ncbi.nlm.nih.gov/15690074/ (https://perma.cc/B8HC-BKXM) (last visited July 26, 2023).

Those with certain comorbid conditions, including liver disease, diabetes, and chronic kidney disease, also fall into the Priority Level 2 category.  (*Id.* ¶ 72, citing Ex. 60 at 8.)  Defendants' Exhibit 60 contains several versions of the BOP Manual—an October 2016 version; an April 2016 version; a May 2017 version; and a January 2018 version.  (Doc. 101 at 418-469).  Each version is approximately 9 pages long, and Defendants do not say which version they are citing to.  The versions prior to January 2018 did set APRI scores greater than 1 and/or stage 2 fibrosis for Priority Level 2 treatment, but the January 2018 version of the BOP Manual sets an APRI score of ≥ 0.7 and/or stage 2 fibrosis as the standard for Priority Level 2 treatment.  (*Id.* at 430.)  The January 2018 version highlights on the second page that "**The APRI cutoff for treatment Priority Level 2 has been lowered to ≥ 0.7**."  (*Id.* at 419 (emphasis in original).)

Defendants also assert that those with an APRI score less than 1 and/or stage 0-1 fibrosis are the lowest priority (Priority Level 3) for treatment.  (DSOF ¶ 73.)  Because APRI scores are used to predict the presence of cirrhosis, the standards no longer require a liver biopsy.  (*Id.* ¶ 74, citing Ex. 60.)  Again, Defendants appears to be citing pre-January 2018 versions of the BOP Manual, whereas the January 2018 version sets an APRI score of less than 0.7 as the standard for Priority Level 3.  (*See* Doc. 101 at 430.)

In addition to the BOP Manual, Corizon Health also followed the ADC "Clinical Practice Guidelines for the Prevention and Treatment for Viral Hepatitis C.  (DSOF ¶ 78.)  The Clinical Practice Guidelines estimate that approximately 23% of ADC prisoners are infected with Hepatitis C.  (*Id.*)  The Clinical Practice Guidelines memorialize the high, intermediate, and low Priority Levels contained within the BOP Manual almost verbatim.[5]  (*Id.* ¶ 79.)  The Clinical Practice Guidelines state that prisoners with an APRI score of 0.7 or above and who have findings suggestive of advanced fibrosis (low albumin or platelets, elevated bilirubin or INR) will be prioritized for treatment.  (*Id.* ¶ 80.)  The Clinical Practice

---

[5] Defendants actually provide two versions of the ADC Guidelines—one with an Effective Date of November 6, 2017 and another with an Effective Date of August 15, 2018.  (*See* Doc. 101 at 471-480 and 504-513.)  Both versions still set Priority Level 2 treatment for those with an APRI score ≥ 1.  (*See id.* at 473, 506.)

Guidelines also state that ADC's vendor "utilizes surrogate marker tests initially to determine Stage and Grade of disease" including the APRI, which "has a good diagnostic utility for predicting severe fibrosis/cirrhosis or in predicting low risk of significant fibrosis.  But does not accurately differentiate intermediate fibrosis from mild or severe fibrosis."  (Doc. 101 at 474, 507.)  The Guidelines also list the blood-based FibroSURE test as another tool to test for fibrosis as well as abdominal ultrasound or CT scan and abdominal imaging studies such as Fibroscan Technology.  (*Id.* at 474-75, 507-08.)

Liver function is monitored through laboratory testing.  (DSOF ¶ 57.)  Liver function is typically monitored through eight different tests: alanine transaminase (ALT) and aspartate transaminase (AST), L-lactate dehydrogenase (LD), gamma-glutamyl transferase (GGT), serum bilirubin, total protein (TP), and albumin.  (*Id.*)  ALT, AST, LD, and GGT are different enzymes made by the liver, and bilirubin is a waste product made by the liver.  (*Id.*)  Albumin is a protein made in the liver.  (*Id.*)

Elevated iron is common in patients with Hepatitis C, and iron levels are monitored through laboratory testing and physical examinations.  (*Id.* ¶ 58.)  Elevated iron levels alone do not indicate certain treatment, and elevated iron levels alone do not indicate liver damage.  (*Id.*)

Tylenol and Ibuprofen are indicated to treat patients with pain, even patients with Hepatitis C and/or liver disease.  (*Id.* ¶ 59.)  Non-steroidal anti-inflammatories (NSAIDs), such as Ibuprofen and Tylenol, can cause liver damage if taken frequently or if they are abused by a patient.  (*Id.*)  In a patient with Hepatitis C, providers can appropriately prescribe and/or recommend use of Tylenol and Ibuprofen if a patient's liver enzymes are monitored through regular laboratory testing.  (*Id.*)  If a patient's enzymes are not elevating, continued use of Tylenol and Ibuprofen is appropriate, but if a patient's enzymes begin elevating and/or a patient is abusing the medication, use of Tylenol and/or Ibuprofen should be discontinued.  (*Id.*)

Anti-fungal medications, such as Fluconazole, can cause liver damage, and in patients with Hepatitis C and/or patients with liver disease, Fluconazole is the best tolerated

medication to treat fungal infections.  (*Id.* ¶ 60.)  Because fungal infections require treatment with an anti-fungal medication, any risk to the patient of liver damage is outweighed by the benefit of treating the infection, and any risk to the patient can be monitored through regular laboratory testing.[6]  (*Id.*)

### B.    Plaintiff's Treatment

On May 11, 2015, Plaintiff was evaluated, and he told the medical provider he had contracted HCV (Hepatitis C virus) through needle use and was diagnosed around 2006. (DSOF ¶ 2; Doc. 101 at 21.)  The provider ordered laboratory tests to monitor Plaintiff's condition.  (DSOF ¶ 2.)

On May 15, 2015, Defendant Dr. Barcklay reviewed Plaintiff's May 6, 2015 laboratory results showing that Plaintiff's APRI score was 0.640.  (*Id.* ¶ 3.)  Plaintiff's iron was normal, his AST was high at 53, with a reference range of 15-40, and his ALT was high at 88, with a reference range of 7-45.  (Doc. 101 at 27.)

On July 2, 2015, Plaintiff saw NP Covington for HCV chronic care.  (DSOF ¶ 4.) Covington noted an APRI score of less than one (0.64), no abnormalities upon exam, and ordered laboratory testing.  (*Id.*)  The results of the July 27, 2015 laboratory test showed an APRI score of 0.390.  (*Id.* ¶ 5.)  Plaintiff's AST was normal, ALT was high at 58, with a reference range of 7-45, and iron was high at 173, with a reference range of 50-170.  (Doc. 101 at 46.)

On January 28, 2016, Plaintiff saw NP Covington for HCV chronic care.  (DSOF ¶ 6.)  Covington noted an APRI score of less than one, no abnormalities upon exam, and ordered laboratory testing.  (*Id.*)  Plaintiff notes that the January 28, 2016 APRI score was calculated to be 0.4, but there are no laboratory notes for him to independently calculate

---

[6] Plaintiff disputes that Fluconazole is the "best tolerated medication to treat fungal infections."  (Doc. 108 ¶ 56, citing Exhibits B and C.)  Plaintiff's Exhibit B appears to be a paper on Fluconazole by the British National Health Service (Doc. 91 at 42-48) and Exhibit C is "HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C" by the American Association for the Study of Liver Disease (Doc. 91 at 50-54.)  Plaintiff does not direct the Court to what in those Exhibits demonstrates that Fluconazole is not the best tolerated medication to treat fungal infections.

1   the APRI score.  (Doc. 108 (Pl.'s Statement of Facts) ¶ 22.)  Covington wrote in Plaintiff's

2   medical chart "APRI SCORE 8/15=0.4," but it is not clear what that note is based on as

3   the latest bloodwork results in the record are dated August 20, 2015.  (Doc. 101 at 52.)

4           On July 13, 2016, Defendant Dr. Barcklay reviewed Plaintiff's laboratory results,

5   which showed an APRI score of 0.574; normal bilirubin, albumin, total protein, and LD;

6   slightly above high GGT at 35, with a reference range of 2-30; and elevated iron at 245,

7   with a reference range of 50-170.  (DSOF ¶ 7.)

8           On August 31, 2016, Plaintiff saw Defendant Dr. Barcklay, who noted an APRI

9   score of 0.57.  (Id. ¶ 8; Doc. 101 at 63.)  Plaintiff's physical exam and vitals were normal.

10  (DSOF ¶ 8.)  Due to Plaintiff's APRI score and lack of related symptoms, Dr. Barcklay

11  determined that Hepatitis C treatment was not indicated, and she ordered Hepatitis A and

12  B vaccines and laboratory tests to check Plaintiff's APRI levels before his next chronic

13  care visit.  (Id.)  Dr. Barcklay did note Plaintiff's elevated iron level, but because Plaintiff

14  had not reported iron-related symptoms and presented with a normal exam, she planned to

15  continue to monitor it through laboratory testing and physical examinations.  (Id.)

16          On September 23, 2016, Plaintiff saw Registered Nurse (RN) Marcela Meza and

17  reported kidney pain at a 7/10 level and requested an x-ray due a history of kidney stones.

18  (Id. ¶ 9.)  Defendant Dr. Barcklay ordered Ibuprofen 600mg three times daily as needed to

19  treat Plaintiff's pain along with other recommendations to treat his underlying condition.

20  (Id.)  The Ibuprofen prescription was renewed on October 26, 2016.  (Id. ¶ 10.)  On

21  November 16, 2016, Plaintiff saw RN Meza for kidney stone follow-up and reported

22  passing stones but continued pain at 4/10.  (Id. ¶ 11.)  Plaintiff's examination was normal,

23  and Dr. Barcklay recommended continued use of Ibuprofen to manage his pain.  (Id.)

24          Plaintiff continued to report kidney-stone related pain at 6/10 and 10/10 at worst

25  during a December 1, 2016 visit with RN Meza, and, along with other recommendations

26  to treat his underlying condition, Dr. Barcklay ordered continuation of Ibuprofen 600mg

27  three times daily as needed to treat his pain.  (Id. ¶ 12.)

28

On January 31, 2017, Plaintiff saw RN Maxine Hilard and reported back and kidney pain, rated at 10/10, associated nausea and fever, blood in his urine for the past 7 months, and that Ibuprofen was not assisting with his pain.  (*Id.* ¶ 13; Doc. 101 at 100.)  Nurse Hilard reported a normal examination and noted that "[t]here is a consult in for a CT of the abdomen." (DSOF ¶ 13; Doc. 101 at 101.)  Dr. Barcklay discontinued Plaintiff's Ibuprofen and prescribed a different pain medication, Naproxen, to attempt to better treat his pain along with other recommendations to treat his underlying condition.  (DSOF ¶ 13.)

On February 10, 2017, Defendant Dr. Barcklay reviewed Plaintiff's February 3, 2017 laboratory results, which showed an APRI score of 0.905; normal albumin, bilirubin, GGT, TP, and LD; and elevated iron at 244, with a reference range of 65-175.  (*Id.* ¶ 14.)  Dr. Barkclay determined that Plaintiff's iron levels alone did not indicate that treatment was necessary even though Plaintiff's AST was high at 68 (reference range less than 34) and his ALT was high at 138 (reference range 10-49).  (*Id.*; Doc. 101 at 109.)

On February 14, 2017, Plaintiff saw Defendant NP Smalley for chronic care follow-up.  (DSOF ¶ 15.)  Plaintiff denied abdominal pain, distension, dark urine, jaundice, or extremity swelling.  (*Id.*)  Plaintiff's physical examination and vitals were normal.  (*Id.*)  Due to Plaintiff's recent APRI score, which was below 1, and lack of related symptoms, Smalley concluded that Hepatitis C treatment was not indicated, even though his iron levels were elevated.  (*Id.*)  NP Smalley ordered a follow-up visit in six months and a laboratory test to check his APRI levels before his next chronic care visit.  (*Id.*)

Plaintiff disputes Smalley's version of this appointment as contained in Defendants' paragraph 15.  (Doc. 108 ¶ 51, citing Defendants' Exhibits 15 and 60.)  Defendants' Exhibit 15 is the medical record from the February 14, 2017 visit, in which Defendant Smalley noted an APRI score of 1.5.  (Doc. 101 at 114.)  Exhibit 60 is the BOP Manual, which Plaintiff says shows he was Priority Level 2 for treatment.  (Doc. 108 ¶ 51.)  It is not certain which version of the BOP Manual Plaintiff is referring to, but under either the May 2017 or the January 2018 version, an APRI score of 1.5 would qualify for Priority Level 2

treatment because even the May 2017 version listed an APRI score of ≥ 1 as Priority Level 2.  (*See* Doc. 101 at 430.)

On February 28, 2017, Plaintiff saw Physician Assistant (PA) Austin Nelson about his continued pain and reported that he preferred Ibuprofen over Naproxen as it provided better pain relief.  (DSOF ¶ 16.)  PA Nelson discontinued Naproxen and prescribed Ibuprofen 600mg three times daily, and this prescription was refilled on March 4, 2017. (*Id.*)  PA Nelson's Assessment Notes show an abdominal CT scan was performed January 17, 2017 and indicated a "non obstructing stone." (*Id*. at 129.)

On March 30, 2017, Plaintiff reported to Nurse Meza that he continued to have kidney pain at 10/10 due to kidney stones and he requested his Ibuprofen 600mg be renewed.  (*Id.* ¶ 17.)  NP Brisbois ordered Ibuprofen 600mg three times daily to treat Plaintiff's pain.  (*Id.*)  The prescription was refilled on April 14, 2017.  (*Id.*)

On March 31, 2017, Plaintiff saw RN Sue Ann Quintero when he returned from an off-site urology consult with a foley catheter.  (*Id.* ¶ 18; Doc. 101 at 141.)  Plaintiff reported flank pain at 10/10, and NP Brisbois prescribed Tylenol #3 300mg four times daily as needed for three days.  (DSOF ¶ 18.)

On April 4, 2017, Plaintiff saw RN Cecily Patmon and reported continued pain and that he had not used all his Tylenol #3 from the prior prescription.  (*Id.* ¶ 19.)  Defendant Dr. Barcklay prescribed Tylenol #3 300mg three times daily as needed for three days to treat his pain.  (*Id.*)

On April 21, 2017, Plaintiff saw NP Brisbois, and NP Brisbois prescribed Ibuprofen 600mg three times daily as needed for pain.  (*Id.* ¶ 20.)  On April 25, 2017, NP Brisbois ordered laboratory testing, which was performed on April 27, 2017.  (*Id.* ¶ 21.)  Plaintiff's albumin, TP, and bilirubin were normal.  (*Id.*)  The results showed high AST at 65 (reference range is less than 34) and high ALT at 96 (reference range of 10-49).[7]  (Doc. 101 at 160.)

---

[7] It does not appear that Plaintiff's iron or platelet levels were tested.  (*See* Doc. 101 at 160-61.)

On May 19, 2017, Plaintiff saw Nurse Quintero upon his return from prostate surgery. (DSOF ¶ 22.) Plaintiff reported lower back and bladder-area pain. (*Id*.) Along with other recommendations and pursuant to discharge instructions, Defendant Dr. Barcklay prescribed Tylenol #3 300mg twice daily as needed for three days to treat his pain. (*Id*.)

On May 22, 2017, Plaintiff saw NP Brisbois and reported continued pain due to his recent surgery. (*Id*. ¶ 23.) NP Brisbois renewed Tylenol #3 300mg twice daily as needed for an additional day and prescribed Ibuprofen 600mg three times daily as needed. (*Id*.) Plaintiff's Ibuprofen was renewed every two weeks until October 25, 2017. (*Id*.)

On August 4, 2017, Defendant NP Smalley reviewed Plaintiff's August 3, 2017 laboratory results, which showed his APRI score at 0.806; normal albumin, bilirubin, GGT, TP, and LD; and elevated iron at 245, with a reference range of 65-175. (*Id*. ¶ 25.) Smalley determined that Plaintiff's iron levels alone did not indicate that treatment was necessary, even though Plaintiff's AST was high at 54 (reference range less than 34) and ALT was high at 101 (reference range 10-49). (*Id*.; Doc. 101 at 185.)

On August 18, 2017, Plaintiff saw NP Brisbois and reported continued bladder and kidney pain, and trouble sleeping, leaning, or sitting down due to pain. (DSOF ¶ 26.) NP Brisbois prescribed two tablets of Tylenol 325mg four times daily as needed. (*Id*.) Plaintiff's Tylenol was consistently renewed through September 30, 2017. (*Id*.)

On November 10, 2017, Plaintiff saw NP Brisbois and reported that his bladder and kidney pain was managed with Tylenol. (*Id*. ¶ 27.) NP Brisbois renewed two tablets of Tylenol 325mg four times daily as needed and Ibuprofen 600mg Ibuprofen three times daily as needed. (*Id*.) Plaintiff's Tylenol was renewed through December 29, 2017, and his Ibuprofen was renewed through December 25, 2017. (*Id*.)

On January 9, 2018, Plaintiff saw NP Brisbois upon his return from the hospital.[8] (*Id.* ¶ 28.)  Plaintiff reported his pain was managed, and NP Brisbois renewed Ibuprofen 600mg three times daily as needed and Tylenol #3 300mg twice daily for two days.  (*Id.*)

On January 10, 2018, Plaintiff saw Nurse Quintero for foley catheter removal.  (*Id.* ¶ 29.)  Defendant Dr. Barcklay renewed Plaintiff's prescription for two tablets of Tylenol 325mg four times daily as needed and Ibuprofen 600mg three times daily as needed, and both prescriptions were renewed through January 25, 2018.  (*Id.*)

On January 26, 2018, Plaintiff saw Defendant Dr. Barcklay for continued kidney stone pain as well as knee and back pain.  (*Id.* ¶ 30.)  Plaintiff's physical examination was largely normal, but Plaintiff occasionally had to change his position due to continued pain.  (*Id.*)  Dr. Barcklay renewed Plaintiff's prescriptions for two tablets of Tylenol 325mg four times daily as needed and Ibuprofen 600mg three times daily as needed to treat his kidney, knee, and back pain.  (*Id.*)  His Ibuprofen was renewed through May 25, 2018, and his Tylenol was renewed through May 17, 2018.  (*Id.*)

On February 1, 2018, Plaintiff saw Defendant NP Smalley for chronic care follow-up, and Plaintiff denied abdominal distension, dark urine, jaundice, pruritus, unusual bleeding or bruising, and swelling to extremities, but he reported continued pain due to kidney stones.  (*Id.* ¶ 31.)  Plaintiff's physical examination and vitals were normal.  (*Id.*)  NP Smalley reviewed his recent laboratory results, which indicated an APRI score below 1, and due to the APRI score and lack of related symptoms, Smalley determined that Hepatitis C treatment was not indicated.  (*Id.*)  NP Smalley ordered follow-up in six months and a laboratory test to check APRI levels before the next chronic care visit, and because Plaintiff did not report symptoms and his exam was normal, NP Smalley planned to continue to monitor his iron levels through laboratory testing and examination.  (*Id.*)

---

[8] The Corizon medical record does not say why Plaintiff was at the hospital and only says "procedure late yesterday" and "catheter will remain in until tomorrow."  (*See* Doc. 101 at 205.)

Plaintiff appears to dispute Defendants' paragraph 31 and the calculation of his APRI score.  (*See* Doc. 108 ¶ 54, citing Defs.' Ex. 32.)  Defendants' Exhibit 32 is the medical record from the February 1, 2018 encounter, and under Objective Notes is an APRI score of 0.78.  (Doc. 101 at 244.)  Plaintiff points out the Subjective Notes from the same record state "Pending current labs," which Plaintiff says, "calls into question how the APRI score was calculated."  (Doc. 108 ¶ 54; Doc. 101 at 243.)  The Court notes that the only laboratory report prior to the February 1, 2018 encounter is dated August 3, 2017, for which Smalley had calculated an APRI score of APRI score at 0.806.  (*See* Doc. 101 at 184.)

On February 5, 2018, Defendant NP Smalley reviewed Plaintiff's February 2, 2018 laboratory results, which showed an APRI score of 0.834; normal albumin, bilirubin, GGT, TP, and LD; and elevated iron of 228, with a reference range of 65-175.  (DSOF ¶ 32.)  Smalley determined that Plaintiff's iron levels alone did not indicate that treatment was necessary, even though Plaintiff's AST was high at 61 (reference range under 34) and his ALT was high at 105 (reference range 10-49).  (*Id.*; Doc. 101 at 251.)

On May 22, 2018, Defendant Dr. Jordan renewed Plaintiff's prescription for two tablets of Tylenol 325mg two times daily as needed and Ibuprofen 600mg three times daily as needed to treat his back pain.  (DSOF ¶ 33.)  Plaintiff's Ibuprofen was renewed through September 13, 2018, and his Tylenol was renewed through September 5, 2018.  (*Id.*)

On July 12, 2018, Defendant NP Smalley reviewed Plaintiff's July 10, 2018 laboratory results, which showed an APRI score of 0.919; normal albumin, bilirubin, GGT, LD, and TP; and elevated iron at 227, with a reference range of 65-175.  (*Id.* ¶ 34.)  Smalley determined that Plaintiff's iron level alone did not indicate treatment, even though his AST was high at 70 (reference range under 34) and his ALT was high at 128 (reference range 10-49).  (*Id.*; Doc. 101 at 266.)

Also on July 12, 2018, Plaintiff saw Defendant NP Smalley for chronic care follow-up, and Plaintiff denied abdominal distension, dark urine, jaundice, pruritus, unusual bleeding or bruising, and swelling to extremities, but he reported continued pain due to kidney stones.  (DSOF ¶ 35.)  Plaintiff's physical examination and vitals were normal.  (*Id.*)

NP Smalley ordered follow-up in six months and a laboratory test to check APRI levels before the next chronic care visit, and because Plaintiff did not report symptoms and his exam was normal, NP Smalley planned to continue to monitor his iron levels through laboratory testing and examination.  (*Id.* ¶ 35.)

On September 30, 2018, PA Daniel Delp renewed Plaintiff's prescription for two tablets of Tylenol 325mg twice times daily as needed and Ibuprofen 600mg three times daily as needed to treat his back pain.  (*Id.* ¶ 36.)  Plaintiff's Ibuprofen was renewed through January 25, 2019, and his Tylenol was renewed through January 9, 2019.  (*Id.*)

On December 20, 2018, Defendant NP Smalley reviewed Plaintiff's December 18, 2018 laboratory results, which showed an APRI score of 1.012; normal albumin, bilirubin, GGT, LD and TP; and elevated iron at 245, with a reference range of 65-175.  (*Id.* ¶ 37.) Smalley determined that Plaintiff's iron level alone did not indicate treatment even though Plaintiff's AST was high at 75 (reference range under 34) and his ALT was high at 119 (reference range 10-49).  (*Id.*; Doc. 101 at 283.)

On February 5, 2019, Defendant NP Smalley reviewed Plaintiff's January 31, 2019 laboratory results, which showed an APRI score of 1.374; normal albumin, bilirubin, GGT, LD, and TP; and iron level of 191, with a reference range of 65-175.  (DSOF ¶ 38.)  Smalley determined that Plaintiff's iron level alone did not indicate treatment even though Plaintiff's AST was high at 100 (reference range under 34) and his ALT was high at 183 (reference range 10-49).  (*Id.*; Doc. 101 at 288.)

That same day, NP Smalley saw Plaintiff for chronic care follow-up, and Plaintiff denied abdominal pain, distension, dark urine, jaundice, pruritus, unusual bleeding, bruising, or swelling to extremities, but he did report having urinary issues, a potentially enlarged prostate, and dribbling urine.  (DSOF ¶ 39.)  He denied dysuria and frequency, and his physical examination and vitals were normal.  (*Id.*)  NP Smalley reviewed his recent laboratory results, which indicated an APRI score below 2 (1.37), and determined that due to the APRI score and lack of related symptoms, Hepatitis C treatment was not indicated. (*Id.*; Doc. 101 at 293.)  However, due to Plaintiff's report of urinary issues, NP Smalley

ordered Fibrosure and a Prothrombin Time Test (PT INR) and referred him to a provider.[9] (DSOF ¶ 39.)  NP Smalley ordered follow-up in six months, a laboratory test to check his APRI levels before his next chronic care visit, and because Plaintiff did not report symptoms and his exam was normal, NP Smalley planned to continue to monitor his iron levels through laboratory testing and examination.  (*Id.*)

Plaintiff disputes that an APRI score less than 2 indicates that Hepatitis C treatment was not indicated.  (*See* Doc. 108 ¶ 52, again citing Defs.' Exs. 15 and 60.)

On February 21, 2019, Defendant NP Ngueha saw Plaintiff, who reported urinary issues, including feeling as if his prostate was enlarged and dribbling urine, but he denied dysuria or frequency.  (DSOF ¶ 40.)  Plaintiff also reported a previous widening of his urethra due to urinary issues.  (*Id.*)  Plaintiff's physical examination was largely normal, and NP Ngueha assessed a differential diagnosis of potential prostate enlargement, kidney stone, and chronic pain due to osteoarthritis.  (*Id.*)  NP Ngueha discussed the side effects of chronic use of NSAIDs, such as Tylenol and Ibuprofen, and advised Plaintiff to take medication only when necessary.  (*Id.*)  NP Ngueha renewed Plaintiff's prescription for two tablets of Tylenol 325mg twice times daily as needed and Ibuprofen 600mg three times daily as needed to treat his chronic pain, and Plaintiff's Ibuprofen was renewed through March 4, 2019, and his Tylenol was renewed through June 15, 2019.  (*Id.*)

On March 10, 2019, Defendant NP Ngueha renewed Plaintiff's prescription for Ibuprofen 600mg three times daily as needed to treat his back pain, and his Ibuprofen was renewed through April 6, 2019.  (*Id.* ¶ 41.)

On April 17, 2019, Defendant Dr. Jordan renewed Plaintiff's prescription for Ibuprofen 600mg twice daily as needed to treat his back pain, and his Ibuprofen was renewed through May 1, 2019.  (*Id.* ¶ 42.)

---

[9] The Court did not locate an order for those tests or their results in the record.  Nor is it clear what "provider" Defendant NP Smalley referred Plaintiff to because the next medical encounter in the record is with NP Ngueha, and it is not clear why NP Smalley would refer Plaintiff to a different Nurse Practitioner.

On April 30, 2019, Defendant NP Ngueha saw Plaintiff, who reported an allergic reaction for two weeks and having been treated for skin dermatitis on previous visits. (*Id.* ¶ 43.) Plaintiff was very itchy, and NP Ngueha observed a generalized rash with clusters to the neck and head in round, red, raised patches and assessed a fungal infection and itchy skin. (*Id.*) NP Ngueha prescribed Fluconazole 150 milligrams once daily for five days.[10] (*Id.*)

On May 18, 2019, Defendant Ngueha saw Plaintiff in follow up for his fungal infection; Plaintiff reported that his skin had improved, but he had noticed yellowing nails. (*Id.* ¶ 44.) NP Ngueha observed yellow and brittle nails to both Plaintiff's hands and feet, planned to continue to treat his fungal infection, and renewed Fluconazole 150mg for eight days. (*Id.*) She also ordered a laboratory test to test Plaintiff's kidney function due to his yellowing nails and to monitor his kidney function due to taking Fluconazole. (*Id.*)

On May 27, 2019, Defendant NP Ngueha reviewed Plaintiff's May 23, 2019 laboratory results. (*Id.* ¶ 46.) Plaintiff's albumin, bilirubin, and TP were normal, but his AST was significantly elevated at 196, with a reference range of under 40, and his ALT was also significantly elevated at 263, with a reference range under 41. (*Id.*; Doc. 101 at 331.) Plaintiff asserts that because his platelets were not measured on May 23, 2019, his

---

[10] Plaintiff asserts that Fluconazole "is only prescribed if a patient is likely to get vaginal thrush, have a weakened immune system, have had a bone marrow transplant, have HIV, or are at risk of getting cryptococcal meningitis." (Doc. 108 ¶ 38.) In support, Plaintiff cites "Exhibit A," which is versions of the BOP Guidance from 2016-2018 for the treatment of chronic Hepatitis C, but Plaintiff did not specify a page number, and therefore the Court could not verify Plaintiff's statement. (*See* Doc. 91 at 18-40.) According to the Mayo Clinic, Fluconazole "is used to treat serious fungal or yeast infections, including vaginal candidiasis, oropharyngeal candidiasis (thrush, oral thrush), esophageal candidiasis (candida esophagitis), other candida infections (including urinary tract infections, peritonitis [inflammation of the lining of the stomach], and infections that may occur in different parts of the body), or fungal (cryptococcal) meningitis" as well as "to prevent candidiasis in patients having bone marrow transplants who receive cancer or radiation treatment." Mayo Clinic, *Drugs and Supplements, Fluconazole (Oral Route)*, *available at* https://www.mayoclinic.org/drugs-supplements/   fluconazole-oral-route/description/drg-20071428 (https://perma.cc/B5TJ-QXYU) (last visited July 26, 2023.)

APRI score could not be calculated, but given a baseline platelet count of 240, his APRI score would be 2.042.  (Doc. 108 ¶ 42.)

On June 22, 2019, Plaintiff saw Defendant NP Ngueha, who completed a physical examination and observed mid-epigastric and right upper quadrant abdominal tenderness. (DSOF ¶ 47.)  Due to his symptoms and recent laboratory results, NP Ngueha ordered additional laboratory testing, including a hepatic function test, Fibrotest/Actitest, and a Prothrombin Time (PT)/Partial Thromboplastin Time test, to determine the functionality of his liver.[11]  (*Id*.)  She also advised Plaintiff to discontinue Ibuprofen and ordered chronic care laboratory tests for follow-up in six months.  (*Id*.)

On June 27, 2019, Plaintiff had a Fibrotest/Actitest, which indicated A3 inflammation and severe fibrosis.  (*Id.* ¶ 48.)  The test showed a fibrosis stage of "F3-Bridging fibrosis with many septs," a high Necroinflammat ACT score of 0.75, with a reference range of 0.00-0.17, a high Necorinflammat ACT grade of "A3-Severe Activity," a high Alpha 2-Macroglobulin QN score of 348, with a reference range of 110-276.  (Doc. 101 at 346.)  Plaintiff also had a hepatic function test, which was normal except his AST and ALT levels.  (DSOF ¶ 48.)

Corizon's contract with ADCRR ended on June 30, 2019.  (*Id.* ¶ 49.)

On July 9, 2019, Defendant NP Smalley reviewed Plaintiff's July 3, 2019 laboratory results, including a PT INR, which tests for a patient's ability to clot blood.  (*Id.* ¶ 50.)  Plaintiff's INR results were slightly elevated at 1.16 INR (reference 0.88-1.10) and 12 Prothrombin Time (reference 9.5-11.5).  (*Id*.)  His fibrosis score was elevated at 0.65 (reference 0.00-0.21).  (*Id*.)  However, Plaintiff's APRI score had lowered to 0.688.  (*Id*.)

---

[11] "The limitations of the liver biopsy have fueled the development of non-invasive [non-alcoholic fatty liver disease] biomarkers[,]" and "FibroTest™ (FibroSURE in the US) is a panel of biochemical markers that originally was developed for the assessment of bridging fibrosis in patients with hepatitis C (HCV)."  National Library of Medicine, *FibroTest for Evaluating Fibrosis in Non-Alcoholic Fatty Liver Disease Patients: A Systematic Review and Meta-Analysis*, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8198930/#B20-jcm-10- 02415 (https://perma.cc/77EP-6YEW) (last visited July 31, 2023).

1   Plaintiff's AST was high at 55 (reference range 15-40), his ALT was high at 93 (reference

2   range 7-45), and iron was high at 286 (reference range 50-170).  (Doc. 101 at 352.)

3   On July 31, 2019, Plaintiff saw Defendant NP Smalley for chronic care follow-up,

4   and Plaintiff reported intermittent abdominal pain related to kidney stones.  (DSOF ¶ 51.)

5   Plaintiff denied distension, dark urine, jaundice, pruritus, unusual bleeding, bruising, or

6   swelling to extremities.  (*Id.*)  His APRI score had improved, but he had a Fibrosis score

7   of F3-F4.[12]  (*Id.*; Doc. 101 at 355.)  NP Smalley completed a physical examination, which

8   was normal, but due to Plaintiff's recent fibrosis results, NP Smalley sent an email to the

9   Hepatitis C committee, requesting treatment.  (DSOF ¶51.)  Smalley wrote in her notes

10  "liver functions improved from previous with current APRI 0.69.  However, fibrosis score

11  is F3 on recent labs and F4 in June.  Patient perseverating on fibrosis score and concerned

12  about liver failure.  Demanding treatment for HCV.  Unclear if previously submitted as

13  APRI 2.45 in May."  (Doc. 101 at 355.)

14  On September 12, 2019, Plaintiff received an ultrasound regarding his Hepatitis C.

15  (DSOF ¶ 52.)  Dr. Peter Memslakis assessed cirrhosis without focal hepatic mass and

16  nonobstructing left renal calculus, no left or right hydronephrosis.  (*Id.*)

17  Over the next few months, the Hepatitis C committee requested additional

18  laboratory results.[13]  (*Id.* ¶ 53.)

19  On January 7, 2020, Plaintiff began receiving Hepatitis C treatment.[14]  (*Id.*)

---

[12] There are four fibrosis stages from 0 to 4 using the METAVIR scoring system: "F0—no fibrosis, F1—portal fibrosis, F2—periportal fibrosis, F3—bridging fibrosis, F4—cirrhosis."  National Library of Medicine, *Patients with stage 3 compared to stage 4 liver fibrosis have lower frequency of and longer time to liver disease complications*, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5944985/ (https://perma.cc/NF8R-8S2K) (last visited July 26, 2023).

[13] Although Defendants provide the medical records showing certain tests were ordered between August 2, 2019 and October 29, 2019, they do not provide the results of any testing or explain why those tests were performed.  (*See* Doc. 101 at 364-375.)  Nor do Defendants explain the role of the Hepatitis C committee.

[14] The only record Defendants provide of Plaintiff's Hepatitis C treatment is one

On April 6, 2020, Plaintiff saw Defendant NP Smalley for chronic care follow-up and after completing treatment for Hepatitis C.  (*Id.* ¶ 54.)  Plaintiff had normal liver function tests, including normal AST, ALT, and platelet counts, and a negative viral load.  (*Id.*)  Plaintiff denied distension, dark urine, jaundice, pruritus, unusual bleeding, bruising, or swelling to extremities, but he reported abdominal pain related to kidney stones.  (*Id.*)  Although Plaintiff had no indication of Hepatitis C infection, NP Smalley ordered continued follow-up and laboratory testing to monitor him.  (*Id.*)

On June 26, 2020, Plaintiff received an abdominal CT, and Dr. Mamalakis assessed a non-obstructing left renal calculus, no hydronephrosis, a large hiatal hernia (which was slightly increased from his prior CT), chronic hepatomegaly[15] with hepatosteatosis (fatty liver), and no hepatic mass.  (*Id.* ¶ 55.)

On February 27, 2021, Plaintiff received an abdominal ultrasound.  (*Id.* ¶ 56.)  Dr. Lloyd Wagner assessed no hepatic mass, no gallstones, and prominent renal pelves bilaterally.  (*Id.*)

## IV.    Eighth Amendment Standard

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

---

dated January 7, 2020 titled "Provider – Review" in which Defendant Dr. Jordan noted "medication ordered, refer list (hep C treatment) scheduled."  (Doc. 101 at 376-78.)  Defendants do not explain what the Hepatitis C treatment entails or when Plaintiff received the medications.

[15] Hepatomegaly is an enlarged liver and "is a sign of an underlying problem, such as liver disease, congestive heart failure or cancer."  Mayo Clinic, *Enlarged Liver*, *available at* https://www.mayoclinic.org/diseases-conditions/enlarged-liver/symptoms-causes/syc-20372167 (https://perma.cc/EYP5-QFNL) (last visited July 31, 2023).

*McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096.  An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.  Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983).  "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference.  *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.

The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## V.   Discussion

### A.   Serious Medical Need

There is no dispute that Plaintiff had Hepatitis C.  Further, the available medical records show that Plaintiff's condition was "worthy of comment or treatment[,]" including chronic care appointments, routine blood testing, abdominal imaging, and eventually, Hepatitis C treatment.  *See McGuckin*, 974 F.2d at 1059-60.  Thus, this record supports the finding of a serious medical need, and the Court will therefore consider whether Defendants' actions amounted to deliberate indifference.

### B.   Deliberate Indifference

Plaintiff alleged in his Second Amended Complaint that beginning in May 2016, Defendants Barcklay, Jordan, Smalley, and Ngueha prescribed Ibuprofen and Tylenol for Plaintiff, even though those medications were contraindicated by Plaintiff's Hepatitis C. (Doc. 13 at 12.)  In April 2019, Plaintiff was prescribed Fluconazole for skin rashes even though Fluconazole was contraindicated for persons with Hepatitis C.  (*Id*. at 12, 15.)  In January 2020, Plaintiff was diagnosed with severe liver damage and stage 4 liver disease, and Plaintiff's Hepatitis C was treated that year.  (*Id*. at 13.)  In 2017, a CT liver scan showed Plaintiff's liver was normal, and Plaintiff attributes the damage to his liver between 2017 and 2020 to Defendants' refusal to treat his Hepatitis C until 2020 and prescribing medications that were contraindicated.  (*Id*. at 14-15.)

. . . .

. . . .

. . . .

1    **1.    Dr. Barcklay**

2    **a.    Hepatitis C Treatment**

3    Defendants argue that based on Plaintiff's presentation, his labs, and Dr. Barcklay's

4    assessment, Dr. Barcklay did not believe treatment was medically indicated because

5    Plaintiff's APRI scores were less than one on the occasions she saw him.  (Doc. 103 at 12.)

6    Moreover, they argue, Dr. Barcklay did not decide who received Hepatitis C treatment.

7    (*Id.*)  Defendants contend that Plaintiff has merely alleged that he was not receiving the

8    kind of treatment he believed was indicated, but that is insufficient to overcome summary

9    judgment.  (*Id.*)

10   Plaintiff responds that once his APRI score reached and exceeded 0.7 in August

11   2017, he should have received treatment according to Defendants' standard of care.  (Doc.

12   107 at 7.)  Plaintiff argues that Dr. Barcklay did in fact decide who received treatment by

13   not recommending Plaintiff to the Hepatitis C committee.  (*Id.*)

14   Defendants appear to be basing their argument on the May 2017, or earlier, version

15   of the BOP Manual which lists APRI scores $\geq 1$ as qualifying for Priority Level 2 treatment.

16   However, that level was lowered to $\geq 0.7$ in January 2018.  While the 2018 version of the

17   ADC Guidelines did not lower the level for Priority Level 2 treatment to $\geq 0.7$, Defendants

18   assert that ADC and Corizon Health had adopted the BOP Manual for prioritizing prisoners

19   for Hepatitis C treatment, thus making an APRI score of $\geq 0.7$ the Priority Level 2 threshold

20   for treatment as of January 2018.  (Doc. 101 ¶ 62.)

21   The record reflects that Plaintiff saw Defendant Dr. Barcklay at least two times—

22   on August 31, 2016 and January 26, 2018.  Plaintiff's most recent bloodwork prior to that

23   second visit was on August 3, 2017, when his APRI score was 0.806, his iron was high at

24   245 (reference range 65-175), his AST was high at 54 (reference range 15-40) and his ALT

25   was high at 101 (reference range 7-45).  Earlier medical records showed even higher APRI

26   scores of 1.5 on February 14, 2017 and 0.905 on February 7, 2017.

27   Based on this record, there is a question of fact why Plaintiff was not prioritized for

28   Level 2 treatment, or at least further testing, at the time he saw Dr. Barcklay in January

2018.  Also, it is not clear to the Court that Defendants' seemingly heavy reliance on APRI scores and iron levels was not deliberately indifferent, especially when Plaintiff's later 2019 APRI score had dropped to 0.688 but his Fibrosure test showed he had F3-F4 cirrhosis staging and at least two of his enzymes (AST and ALT) had been elevated since 2015. Even the ADC Guidelines state that while the APRI score "has a good diagnostic utility for predicting severe fibrosis/cirrhosis or in predicting low risk of significant fibrosis," it "does not accurately differentiate intermediate fibrosis from mild or severe fibrosis," and the ADC Guidelines list the blood-based Fibrosure test as another tool to test for fibrosis as well as abdominal ultrasound or CT scan and abdominal imaging studies such as Fibroscan Technology.  (Doc. 101 at 474-75.)

But even on the APRI score alone, Plaintiff met the criteria for Priority Level 2 treatment under the BOP Manual's criteria in February 2017 and in January 2018, yet Dr. Barcklay did not refer Plaintiff to the Hepatitis C committee for treatment consideration. Nor do Defendants explain why Plaintiff was not referred for at least further testing once his APRI levels met the BOP level for Priority Level 2 treatment.

Defendants do not address whether Plaintiff was harmed by the delay in treating in his Hepatitis C.  The evidence shows that after treatment, Plaintiff still had chronic hepatomegaly with hepatosteatosis, raising, at a minimum, a question of fact whether Plaintiff was harmed by the delay in treatment.  Accordingly, based on this record, there is a question of fact whether Defendant Barcklay was deliberately indifferent to Plaintiff's serious medical needs regarding treatment for Hepatitis C, and the Court will deny summary judgment to Dr. Barcklay as to the lack of Hepatitis C treatment prior to 2020.

### b.    Medications

Defendants contend that Dr. Barcklay was not involved in prescribing Fluconazole to Plaintiff, and, while Dr. Barcklay did prescribe Tylenol and Ibuprofen for Plaintiff's chronic and acute pain, she continually monitored Plaintiff's enzyme levels during treatment and those enzyme levels "continued to be normal and reassuring, indicating that it was safe, indicated, and appropriate to continue utilizing them to treat Plaintiff's pain."

1   (Doc. 103 at 12-13.)  Defendants assert that Dr. Barcklay was not treating Plaintiff when

2   his lab results returned with elevated enzyme levels, but his medications were discontinued.

3   (*Id.* at 13.)

4       The record reflects that between May 15, 2015—when providers began monitoring

5   Plaintiff's Hepatis C—and July 31, 2019—when Defendant Smalley requested Hepatitis C

6   treatment for Plaintiff—Plaintiff had the following abnormal laboratory results:

| Date | APRI | Iron (normal reference range 50-170) | AST (normal reference range 15-40) | ALT (normal reference range 7-45) |
|------|------|------|------|------|
| May 15, 2015 | 0.640 | Normal | 53 | 88 |
| July 27, 2015 | 0.390 | 173 | Normal | 58 |
| Jan. 28, 2016 | NA (not available) | 245 | NA | NA |
| Aug. 31, 2015 | 0.57 | NA | NA | NA |
| Feb. 7, 2017 | 0.905 | 244 | 68 | 138 |
| Feb. 14, 2017 | 1.5 | NA | NA | NA |
| April 27, 2017 | NA | NA | 65 | 96 |
| Aug. 3, 2017 | .806 | 245 | 54 | 101 |
| Feb. 2, 2018 | 0.834 | 228 | 61 | 105 |
| July 2, 2018 | 0.919 | 227 | 70 | 128 |
| Dec.18, 2018 | 1.012 | 245 | 75 | 119 |
| Jan. 31, 2019 | 1.374 | 191 | 100 | 183 |
| May 2, 2019 | NA | NA | 196 | 263 |
| July 3, 2019 | 0.688 | 286 | 55 | 93 |

As noted, the record reflects that Plaintiff saw Defendant Dr. Barcklay at least two times—in August 2016 and January 2018—and that Dr. Barcklay periodically reviewed Plaintiff's lab results.  The record further reflects that Dr. Barcklay prescribed Ibuprofen for kidney stone pain on September 23, 2016, recommended continued use of Ibuprofen in November and December 2016, discontinued Ibuprofen and prescribed Naproxen in

January 2017, prescribed Tylenol in April 2017, renewed Tylenol in January 2018 and added Ibuprofen and renewed both later that same month.  During that time, Plaintiff's enzymes AST and ALT were consistently above normal levels, contrary to Dr. Barcklay's averment that Plaintiff's enzyme levels "continued to be normal and reassuring, indicating that it was safe, indicated, and appropriate to continue utilizing them to treat Plaintiff's pain." (Doc. 103 at 12-13.)  Defendants do not explain which enzymes Dr. Barcklay was referring to as being "normal and reassuring," but at least two enzymes—AST and ALT— were not in the normal range.  In addition, in February 2017 and January 2018, Plaintiff met the Priority Level 2 for Hepatitis C treatment, and it is not clear to the Court that continued use of NSAIDs is medically appropriate once a patient meets that level.  Moreover, Corizon's own practice states that continued use of Tylenol and Ibuprofen is appropriate if a patient's enzymes are not elevating but the medications should be discontinued if the patient's enzymes are elevating.  (Doc. 101 ¶ 59.)

Here, at least two of Plaintiff's enzymes were consistently above normal levels, although the numbers would fluctuate.  Because Plaintiff's AST and ALT enzyme levels were above normal and almost always increasing, there is a question of fact whether the continued use of Tylenol and Ibuprofen was deliberately indifferent to Plaintiff's serious medical needs, and the Court will deny summary judgment to Defendant Barcklay with respect to the prescribing of Tylenol and Ibuprofen.  However, there is no evidence that Dr. Barcklay was involved in Plaintiff's care on April 30, 2019, when Defendant Ngueha prescribed Fluconazole, and the Court will grant summary judgment to Defendant Barcklay with respect to the prescribing of Fluconazole.

### 2.      Dr. Jordan

Defendants argue that Dr. Jordan did not evaluate Plaintiff for treatment of Hepatitis C and only prescribed Tylenol and Ibuprofen to assist with his chronic and acute pain, continually monitored Plaintiff's enzyme levels, which were "normal and reassuring" during his treatment of Plaintiff, was not treating Plaintiff when his laboratory results

returned with elevated levels and was not involved in prescribing Flucanozole. (Doc. 103 at 17.)

The evidence reflects that Dr. Jordan prescribed Tylenol and Ibuprofen in May 2018 and those prescriptions were renewed in September 2018. Dr. Jordan again prescribed Ibuprofen in April 2019 and the prescription was renewed in May 2019. At those times, Plaintiff's APRI score met the level for Priority Level 2 treatment and at least two of his enzymes—AST and ALT—were significantly elevated during the times Dr. Jordan was prescribing Tylenol and Ibuprofen. Again, Defendants do not explain what enzymes were "normal and reassuring," indicating it was safe to continue prescribing Tylenol and Ibuprofen. Based on this record, there is a question of fact whether Dr. Jordan was deliberately indifferent in prescribing Tylenol and Ibuprofen for Plaintiff. However, there is no evidence that Dr. Jordan was involved when NP Nguesha prescribed Fluconazole, and the Court will grant summary judgment to Dr. Jordan as to that aspect of Plaintiff's Eighth Amendment claim.

Although Defendants argue Dr. Jordan did not evaluate Plaintiff for treatment of Hepatitis C, Dr. Jordan had access to Plaintiff's laboratory results indicating he qualified for Priority Level 2 treatment while Dr. Jordan was prescribing medications that may have been contraindicated for Plaintiff. As a treating physician, who at a minimum prescribed medications for Plaintiff, there is at least a question of fact whether Dr. Jordan was deliberately indifferent to Plaintiff's serious medical needs regarding treatment for Hepatitis C, and the Court will deny summary judgment to Dr. Jordan as to the lack of Hepatitis C treatment prior to 2020.

### 3.    NP Nguesha

Defendants argue that NP Nguesha did not evaluate Plaintiff for treatment of Hepatitis C and her sole involvement was in recognizing some symptoms of liver issues, which she appropriately recognized and investigated, and ordered additional testing to check Plaintiff's status. (Doc. 103 at 15.) Defendants further argue that NP Nguesha had to prescribe an anti-fungal to treat Plaintiff's symptoms, and that Fluconazole was the best

option.  (*Id.* at 15-16.)   Defendants assert that when laboratory testing indicated that Plaintiff's enzymes were elevated, Plaintiff had already finished his course of treatment and Fluconazole was not prescribed again.  (*Id.* at 16.)  Defendants likewise argue that NP Ngueha's prescribing of Tylenol and Ibuprofen was appropriate, she continually monitored his enzyme levels, which "continued to be normal and reassuring," and immediately discontinued his Ibuprofen when his enzymes became elevated, and he was not taking Tylenol at the time.  (*Id.*)

The evidence reflects that Plaintiff saw NP Ngueha four times between February and June 2019.  At the February 2019 visit, NP Ngueha warned Plaintiff about the chronic use of NSAIDs and to only use them when necessary, but she renewed Tylenol and Ibuprofen at that time, and she renewed his Ibuprofen in March 2019.  In April, NP Ngueha prescribed Fluconazole for Plaintiff's dermatitis infection.  In May, Plaintiff's skin was better, but his nails were yellowing and brittle.  Nevertheless, NP Ngueha renewed the Fluconazole, but ordered lab tests for Plaintiff's kidney function.  NP Ngueha reviewed the bloodwork taken on May 23, 2019 and noted that his AST was significantly elevated, but only at the June 22, 2019 appointment did she discontinue Plaintiff's Ibuprofen and ordered a hepatic function test after noting his abdomen was tender upon examination.

By the time NP Ngueha first saw Plaintiff in February 2019, Plaintiff's APRI score was 1.374, meeting the level for Priority Level 2 treatment, his iron was elevated at 191, his AST was elevated at 100, and his ALT was elevated at 183.  Again, Defendants do not explain what enzymes were "normal and reassuring," indicating it was safe to continue prescribing Tylenol, Ibuprofen and Fluconazole.  Based on this record, there is a question of fact whether NP Ngueha was deliberately indifferent in prescribing Tylenol, Ibuprofen, and Fluconazole for Plaintiff, and whether NP Ngueha was deliberately indifferent in not recommending Plaintiff for Priority Level 2 treatment when she first began treating him.

Accordingly, the Court will deny summary judgment to Defendant Ngueha.

. . . .

. . . .

### 4.     NP Smalley

Defendants argue that Plaintiff saw NP Smalley on multiple occasions, and based on Plaintiff's presentation, labs, and her assessment, she did not believe Hepatitis C treatment was medically indicated.  (Doc. 103 at 13-14.)  Defendants argue that even on occasions Plaintiff's APRI score was more than 0.7, he was still only in Priority Level 2 for treatment, but indications for treatment involve more than just the APRI score, and Plaintiff did not have any symptoms indicating additional laboratory testing or treatment was indicated at that time.  (*Id*. at 14.)  Defendants assert that once Plaintiff's APRI score started minimally increasing, NP Smalley investigated his status and ordered laboratory work, and once there were indications he may have cirrhosis, she immediately referred Plaintiff to the Hepatitis C committee for potential Hepatitis C treatment.  (*Id*.)  Defendants contend there was no indication Hepatitis C treatment was medically indicated before July 2019, and Smalley did not decide who received treatment and could only recommend patients.  (*Id*.)  Defendants also argue that Smalley was not involved in prescribing Fluconazole, Tylenol, or Ibuprofen, but she did review his laboratory results and "confirmed his enzymes remained normal," making it safe, appropriate and indicated for providers to continue to prescribe Tylenol and Ibuprofen for Plaintiff's symptoms.  (*Id*. at 14-15.)

The record reflects that NP Smalley saw Plaintiff regularly for Hepatitis C chronic care between February 2017 and July 2019.  In February 2017, NP Smalley noted an APRI score of 1.5.  After that she noted APRI scores of 0.806 in August 2017, 0.834 in February 2018, 0.919 in July 2018, 1.102 in December 2018, 1.374 in January 2019, and 0.688 in July 2019.  In July 2019, because Plaintiff had a fibrosis score of F3-F4 (apparently based on the blood test NP Ngueha had ordered), NP Smalley emailed the Hepatitis C committee requesting treatment.  In September 2019, an ultrasound showed Plaintiff had developed cirrhosis.  Before July 2019, NP Smalley determined that Plaintiff's APRI score and iron levels, although elevated, did not warrant further testing or treatment, and that follow up in six months was sufficient.  This was despite Plaintiff qualifying for Priority Level 2

treatment as early as February 2017 with an APRI score of 1.5. Plaintiff's APRI scores were well above the BOP's 0.7 threshold for Priority Level 2 treatment as of January 2018, yet Smalley did not refer Plaintiff to the Hepatitis C committee until she reviewed the bloodwork ordered by NP Ngueha in June 2019 showing F3 bridging fibrosis.

Based on this record, there is a question of fact whether NP Smalley was deliberately indifferent to Plaintiff's serious medical needs regarding his Hepatitis C treatment.

There is also a question of fact regarding Plaintiff's prescriptions for Ibuprofen and Tylenol. Although there is no evidence that NP Smalley prescribed or renewed those medications, Smalley was one of Plaintiff's treating providers beginning in 2017 and regularly reviewed his laboratory results. As Defendants acknowledge, NP Smalley concluded that Plaintiff's "enzymes remained normal," making it safe, appropriate and indicated for providers to continue to prescribe Tylenol and Ibuprofen for Plaintiff's symptoms. As with the other Defendants, Defendants do not explain what enzymes were normal such that it was safe to continue prescribing Tylenol and Ibuprofen, when the records show he had at least two elevated enzymes—AST and ALT—throughout the time NP Smalley was treating Plaintiff. Based on this record, there is a question of fact whether NP Smalley was deliberately indifferent in finding it was appropriate for Plaintiff to be prescribed Tylenol and Ibuprofen.

However, there is no evidence that NP Smalley was involved when NP Ngueha prescribed Fluconazole, and the Court will grant summary judgment to NP Smalley as to that aspect of Plaintiff's Eighth Amendment claim.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 103).

(2)     Defendants' Motion for Summary Judgment (Doc. 103) is **granted in part and denied in part as follows**:

        (a)     The Motion is **denied** as to Dr. Barcklay as to Hepatitis C treatment and the prescribing of Tylenol and Ibuprofen and **granted** as to the

prescribing of Fluconazole;

(b)    The Motion is **denied** as to Dr. Jordan as to Hepatitis C treatment and the prescribing of Tylenol and Ibuprofen and **granted** as to the prescribing of Fluconazole;

(c)    The Motion is **denied** as to NP Ngueha;

(d)    The Motion is **denied** as to NP Smalley as to Hepatitis C treatment and the prescribing of Tylenol and Ibuprofen and **granted** as to the prescribing of Fluconazole.

(e)    The Motion **is denied without prejudice** to refiling as to Defendant Corizon if the stay is lifted.  Regarding the stay, Plaintiff is required to prosecute this case.  *See O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1110 (9th Cir. 2006) (stay did not preclude dismissal of case against debtor based on plaintiff's failure to prosecute).  To that end, Plaintiff shall either dismiss this case as to Defendant Corizon (without prejudice to pursuing any claims in bankruptcy court) or move the bankruptcy court to lift the automatic stay to allow this case to go forward in this forum.  As a result, claims against Defendant Corizon will be dismissed, without prejudice, without further notice on October 13, 2023, unless the Court is advised that the bankruptcy stay has been lifted, or a request for a lifting of the bankruptcy stay has not been ruled upon by the bankruptcy court.  If the stay is lifted, Corizon must refile its motion for summary judgment within 15 days of the stay being lifted.

(3)    This action is referred by random lot to Magistrate Judge Willett for the purpose of conducting a settlement conference.

/ / /

/ / /

/ / /

/ / /

(4)    Counsel for Defendants Barcklay, Jordan, Ngueha, and Smalley must arrange for all parties (except Corizon) to jointly contact the chambers of Magistrate Judge Willett at 602-322-7620 within 14 days of the date of this Order to schedule a settlement conference.

Dated this 4th day of August, 2023.

James A. Teilborg
Senior United States District Judge